**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Joseph Snowden, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 2:14-cv-2740-PMD |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| United Rentals (North America) Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant United Rentals (North America) Inc.'s ("United") Motion for Summary Judgment (ECF No. 27). For the reasons set forth herein, the Court grants United's motion in part and denies it in part.

**BACKGROUND**

This action arises out of a trackhoe excavator falling onto its side while Plaintiff Joseph Snowden was inside it. Snowden had rented the excavator from United, and, at the time of the incident, was helping one of United's employees load it onto United's trailer. Although the parties agree on a few background facts, their accounts of the incident diverge greatly. The following summary highlights some of the differences in those accounts and, as this Court must do in a summary judgment motion, construes the evidence in the light most favorable to Snowden.

On July 14, 2011, Snowden signed an agreement with United to rent its excavator for a week. That same day, Snowden picked up the excavator from United's store. Snowden loaded it himself onto a "lowboy" style trailer that he had brought with him to the store.

On July 21, 2011, United sent its employee, Keith Eggers, to pick up the excavator from Snowden. Eggers had worked for United since 2005. United trained Eggers to load and unload

equipment by having him ride along with other United employees for a week as they picked up and delivered equipment. According to Eggers, United never provided him with a training manual on loading and unloading equipment. Eggers' supervisors were former salesmen with no personal experience in equipment transportation.

In his first few months of employment, Eggers had "a couple mishaps loading and unloading equipment." (Def.'s Mot. for Summ. J., Ex. 15, Eggers Evals. & Training Rs., ECF No. 27-16, at 3.) One such mishap was that one of United's excavators fell off of a trailer while Eggers was loading it. The excavator in that 2005 incident was the same make and model as the one involved in this case. In addition, both incidents involved "drop deck" trailers.[1] United never reprimanded Eggers for that incident and did not create a written report of it.[2] On one or two occasions after that, Eggers asked his manager to come with him on pickups to help him load excavators. However, on the day of Snowden's incident, Eggers did not ask for another United employee to assist him.

When Eggers arrived at the pickup location on day of the incident, he spoke with Snowden and then parked the trailer on a grassy shoulder of a nearby road. Snowden says the shoulder was sloped; Eggers believes it was flat.

Eggers first attempted to load the excavator himself, with Snowden guiding Eggers into place as he drove the machine. Eggers managed to get the excavator onto the trailer but failed to position it correctly. He then got out of the excavator to speak with Snowden.

"From here," United admits, the parties' versions of the facts "diverge." (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 27-1, at 6.) According to Snowden, Eggers said that he

---
1. When Eggers first started working for United, United used a lowboy trailer to transport excavators. The lowboy trailer was lower than United's drop-deck trailer and could be made wide enough to accommodate large machinery. According to Eggers, the width and design of lowboy trailers makes loading excavators easy, while it is hard to load them onto drop-deck trailers. Approximately one year before Snowden's incident, United sold its lowboy trailer.

2. The record is unclear as to whether Eggers' 2005 incident was his fault.

2

had tipped excavators off of trailers before and asked Snowden to load the excavator for him. Snowden suggested that Eggers move the trailer onto the road and try loading it again. Eggers insisted that the trailer remain on the shoulder and that Snowden try loading the excavator there. Snowden told Eggers that the shoulder's slope was "going to be a little risky," but Eggers replied that he believed he and Snowden could get the excavator loaded. (Def.'s Mot. for Summ. J., Ex. 1, Tr. of Pl.'s Dep., ECF No. 27-2, at 53:14-16.)

Snowden had loaded equipment onto trailers sitting on steeper slopes, and so he did not believe that what Eggers was asking was "that risky." (Def.'s Mot. for Summ. J., Ex. 1, Tr. of Pl.'s Dep., ECF No. 27-2, at 53:24-54:4.) Believing he could safely get the excavator onto the trailer, Snowden got into its cab and drove it onto the trailer. As he was moving the excavator into position, he kept its excavating boom lowered to the ground for stability.

Eggers stood on one side of the trailer as Snowden worked. Snowden's step-son, Daniel Justice, stood and watched from the other side of the trailer. Once Snowden reached the front of the trailer, Eggers gave him instructions on where to move the excavator so that it would be in the correct position. Snowden followed Eggers' instructions, and then Eggers secured the excavator to the trailer using several chain binders. Snowden then asked Eggers, "You got it?" and Eggers responded "Yeah." (Def.'s Mot. for Summ. J., Ex. 1, Tr. of Pl.'s Dep., ECF No. 27-2, at 55:20-21.) Snowden raised the boom arm onto the trailer and then engaged the excavator's safety lever, making the machine inoperable. As Snowden reached to remove his seat belt, he heard a pop.

The next thing Snowden recalls is being on the ground inside the overturned excavator. Justice came to Snowden's aid and told him that Eggers had not sufficiently tightened one of the chain binders and that as Eggers tried to correct his work, he loosened the binder too much. The

3

binder "c[a]me apart," causing the excavator to skid off of the trailer and turn over. (Def.'s Mot. for Summ. J., Ex. 1, Tr. of Pl.'s Dep., ECF No. 27-2, at 58:1-59:9.)[3]

United presents a different account. Eggers admits that when he tried to load the excavator, "it didn't look like it was set well" and that he expressed his concerns to Snowden. (Def.'s Mot. for Summ. J., Ex. 6, Tr. of Eggers Dep., ECF No. 27-7, at 10:17-22.) Eggers, however, denies that he asked Snowden to load the excavator. Rather, Eggers testified, Snowden told Eggers he had "years of experience"[4] and volunteered to load the excavator. (*Id.* at 10:23-11:3.) Justice warned Snowden not to try loading the excavator because he thought the shoulder's slope made the operation unsafe. Snowden insisted he could do the job, and after some hesitation, Eggers acquiesced.

Standing behind the trailer, Eggers watched Snowden operate the excavator. Snowden managed to drive the machine onto the trailer, but while he was maneuvering the excavator into place, the excavator fell off the trailer and turned onto its side.

After the incident, photographs were taken of the excavator as it sat overturned at the scene. At least one photograph shows the excavator's safety lever disengaged. According to one of United's witnesses, the lever could not have been moved into that position once the excavator fell.

## PROCEDURAL HISTORY

Snowden sued United in state court, asserting causes of action for breach of contract and negligence. United removed the case to this Court. After the discovery period ended, United filed its Motion on April 3, 2015, asking the Court to grant summary judgment on both of

---

3. This account comes from Snowden's deposition. United argues that Snowden's testimony about what Justice told him just after the incident cannot be considered at the summary judgment stage because it is inadmissible hearsay. The Court disagrees. *See* Fed. R. Evid. 803(1), (2).

4. Snowden has over a decade of experience operating excavators.

4

Snowden's claims.  Snowden filed a Response in opposition on April 20, 2015.  Ten days later, United filed a Reply in support of its Motion.  United's Motion is now ripe for consideration.

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity of the parties and the amount in controversy exceeds $75,000.  Snowden is a citizen and resident of South Carolina.  United is a corporation organized under the laws of Delaware.  Its principal place of business is in Connecticut.  Finally, the amount in controversy exceeds $75,000, exclusive of interest and costs.  Therefore, this Court has diversity jurisdiction over this case.  Because this is a diversity case, the Court must apply South Carolina's substantive law and, where necessary, predict how the Supreme Court of South Carolina would decide a particular issue.  *See Nationwide Mut. Ins. Co. v. Powell*, 292 F.3d 201, 203 (4th Cir. 2002); *Hartsock v. Am. Auto. Ins. Co.*, 788 F. Supp. 2d 447, 450 (D.S.C. 2011).

## STANDARD OF REVIEW

To grant a motion for summary judgment, a court must find that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  All evidence should be viewed in the light most favorable to the nonmoving party.  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).  "[I]t is ultimately the nonmovant's burden to persuade [the court] that there is indeed a dispute of material fact.  It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (citations omitted).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

5

disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## DISCUSSION

The Court will grant summary judgment on Snowden's breach of contract cause of action. Snowden has failed to provide evidence of the claim he alleged in his Amended Complaint. As for his negligence cause of action, Snowden has failed to establish that United directly owed him any duty. However, he has established that Eggers owed him a duty of due care, that Eggers' potential liability can be imputed to United, and that there are questions of fact on the other issues affecting United's potential imputed liability. Therefore, the Court will grant summary judgment on only parts of Snowden's negligence claim. The remainder of that claim will proceed to trial.

### I.   Breach of Contract

In his Amended Complaint, Snowden alleges that the July 14, 2011 written rental agreement obligated United to pick up the excavator at the end of the rental period and that by failing to do so, United breached the rental agreement. United argues the rental agreement contained no such term.

The rental agreement is a form that consists primarily of pre-printed terms. One of those terms is that "[a]t the expiration of the Rental Period, Customer will return the Equipment to the Store Location during United's regular business hours." (Def.'s Mot. for Summ. J., Ex. 4, Rental Agreement, ECF No. 27-5, at 2.) Although that boilerplate paragraph goes on to provide procedures to be followed "in the event that United has agreed to pick up" equipment from a

6

customer, (*Id.*), nothing in this particular rental agreement indicates that its terms included United picking up the excavator from Snowden.

Snowden appears to have confirmed that the rental agreement he signed did not require United to pick up the excavator. In an affidavit attached to his Response to United's Motion, Snowden states that on July 21, 2011—a week after he signed the rental agreement—he informed a United representative that he wanted United to pick up the excavator. (Pl.'s Resp. in Opp'n to Summ. J., Ex. 3, Pl.'s Aff., ECF No. 35-4, at ¶3.) The representative responded by offering to pick up the excavator for an additional charge of approximately $100. (*Id.*at ¶¶ 4–5.) Snowden accepted that offer. (*Id.* at ¶ 6.) Thus, Snowden implicitly concedes that the July 14, 2011 rental agreement did not have the pick-up obligation he alleges it had. Rather, in the final hours of the rental period, he and United modified the agreement to provide that United would pick up the excavator in exchange for more money. *See Layman v. State*, 630 S.E.2d 265, 269 (S.C. 2006) ("Once the bargain is formed, and the obligations set, a contract may only be altered by mutual agreement and for further consideration.").

The Amended Complaint does not mention any such modification. Instead, Snowden alleged that all the terms of his agreement with United were reduced to writing in the rental agreement on July 14, 2011, and that United's failure to pick up the excavator constituted a breach of the terms reduced to writing in that document. (Am. Compl., ECF No. 10, at ¶¶ 21–22.) Thus, there is a disconnect between Snowden's theory and the evidence: instead of producing evidence to support the contractual theory he pled, Snowden has produced evidence of a contractual theory he has not pled.

There is no genuine issue of fact as to whether the July 14, 2011 rental agreement obligated United to pick up the excavator. United cannot be held liable in breach of contract for

7

failing to do something that was not part of its contract. Thus, United is entitled to judgment as a matter of law on the breach of contract claim that Snowden actually pled.

As to Snowden's Response and affidavit, Snowden cannot survive summary judgment by now mentioning a contract modification that he never pled. Snowden's Response and affidavit appear to be an attempt to constructively amend the Amended Complaint. The Court declines to allow such an amendment. The discovery period ended before the parties began summary judgment briefing.[5] Allowing a constructive amendment at this late stage would unfairly prejudice United and undermine the fairness of the proceedings. *See Harris v. Reston Hosp. Center, LLC*, 523 F. App'x 938, 946 (4th Cir. 2013) (per curiam) (affirming district court's refusal to consider a new legal argument plaintiff raised at the summary judgment stage because "asserting a new legal theory for the first time in opposing summary judgment amounted to constructive amendment of the amended complaint and thus unfairly prejudiced the defendant"); *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 795–96 (E.D. Va. 2007) (declining to treat new theory, first asserted in opposition to summary judgment motion, as a constructive amendment of complaint; doing so "after the close of discovery . . . would seriously undermine the fairness of the litigation and unfairly prejudice the defendants"), *aff'd*, 562 F.3d 295 (4th Cir. 2009).

The Court will grant summary judgment on Snowden's breach of contract claim.

**II.     Negligence**

To establish a negligence claim, a plaintiff must prove the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by negligent act or omission; and (3) damage proximately caused by the breach." *Doe v. Batson*, 548 S.E.2d 854,

---
5.   Indeed, when Snowden filed his Response on April 20, the case was scheduled for trial during the term of Court beginning June 1. Thus, Snowden attempted to alter the theory of his breach of contract claim approximately five weeks before trial.

8

857 (S.C. 2001). United argues that it did not owe Snowden any duty of care, that he has failed to prove proximate cause, that he assumed the risk of his injuries, and that, as a matter of law, he is more than 50% at fault for his injuries.

### *A.     Duty*

Snowden's theory is that United—both directly and through its employment of Eggers—owed him a duty of due care. United contends it did not owe Snowden either type of duty.

The duty of care is that standard of conduct the law requires of someone in order to protect others against the risk of harm from his acts or omissions. *Snow v. City of Columbia*, 409 S.E.2d 797, 803 (S.C. Ct. App. 1991). It embodies the principle that the plaintiff should not have to suffer a foreseeable harm that can be avoided by the defendant's exercise of reasonable care. *Id.*; *see also Dorrell v. S.C. Dep't of Transp.*, 605 S.E.2d 12, 15 (S.C. 2004) (stating the "common law duty of due care includes the duty to avoid damage or injury to foreseeable plaintiffs"). For negligent conduct to be actionable, it must violate some specific legal duty owed to the plaintiff. *Bauer v. United States*, 882 F. Supp. 516, 519 (D.S.C. 1995) (applying South Carolina law).

#### *i.     Eggers' Duty of Due Care*

In Snowden's version of the incident, Eggers induced Snowden's involvement in the loading, and then the two of them worked together to get it loaded. Moreover, even in United's version of events, Eggers was in control of the trailer and the excavator when Snowden volunteered to perform the loading operation. Under either scenario, Eggers owed Snowden a duty to exercise reasonable care to avoid foreseeable injury to Snowden. As Eggers' employer, United may be vicariously liable if a jury determines Eggers breached his duty and proximately caused Snowden's injuries. *See James v. Kelly Trucking Co.*, 661 S.E.2d 329, 330 (S.C. 2008)

("The doctrine of respondeat superior provides that the employer, as the employee's master, is called to answer for the tortious acts of his servant, the employee, when those acts occur in the course and scope of the employee's employment.").

                *ii.*      *United's Duty of Proper Training, Supervision, and Entrustment*

Snowden contends United directly owed him a duty to properly train and supervise Eggers and to properly entrust him with company property. Normally, a person has no duty to act affirmatively to protect the interests of others. *See, e.g.*, *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 714 (S.C. 2003). That rule, however, has several exceptions. One is that "[a]n employer owes a duty of care to a third party when the possible harm resulting to the third party by the employee could have been reasonably anticipated by the employer." *Rickborn v. Liberty Life Ins. Co.*, 468 S.E.2d 292, 299 (S.C. 1996); *see also James*, 661 S.E.2d at 330 (stating an employer can be directly liable for negligent training, supervision, or entrustment of an employee when it "knew or should have known that its employment of a specific person created an undue risk of harm to the public").

In support of his theory of direct liability against United, Snowden points out the following: Eggers had a previous mishap while loading a similar excavator onto a similar trailer; Eggers had previously asked managers for help in loading excavators; Eggers found loading equipment onto lowboy trailers to be easier than loading with drop-deck trailers; Eggers' training consisted of riding along with other drivers for a week; and Eggers' direct superiors had no personal experience loading heavy equipment onto trailers. Those facts, however, would not have made either version of the incident here reasonably foreseeable to United.

Under South Carolina law, "[s]upervisory liability . . . requires the court to focus specifically on what the employer knew or should have known about the specific conduct of the

10

employee in question."[6]  *Hoskins v. King*, 676 F. Supp. 2d 441, 448 (D.S.C. 2009).  Where, as here, the offending employee's prior conduct is at issue, comparing that prior conduct to the incident giving rise to the lawsuit may inform that analysis.  *See id.* (citing cases where employee's prior similar conduct put employer on notice of need to control employee).

For example, in *Hoskins*, an employee driving her company-issued car killed a bicyclist when she veered out of her lane.  676 F. Supp. 2d at 444–45.  At the time, the employee was talking on a cell phone and was either adjusting the car's stereo or attending to her dogs, which were travelling with her.  *Id.*  No evidence suggested that speed played any role in the collision.  *Id.* at 445.  In the two preceding years, the employee had received two speeding tickets.  *Id.* at 446.  She had also rear-ended a car while talking on her cell phone, but the accident caused no personal injuries or property damage.  *Id.* at 446–47.  The bicyclist's widow asserted a negligent supervision claim against the employer, arguing that the employee's driving history put the employer on notice that the employee's driving presented an undue risk of harm to the public.  *See id.* at 446.  This Court disagreed and granted the employer summary judgment.  The Court held that the employee's driving record, "while blemished, did not foreshadow the event that brought this case before this court" and therefore did not put the employer on notice of her unreasonable risk of harm.  *Id.* at 447.  The prior driving incidents were too dissimilar to the collision for the Court to hold that the employer should have foreseen the collision.  *Id.*

Snowden faces the same problem as the plaintiff in *Hoskins*.  Eggers' prior loading incident, prior requests for assistance, trailer preferences, and training would not have enabled United to anticipate that Eggers would allow a customer to load up equipment after Eggers failed

---

6.  This requirement also applies to a claim of negligent training, as such claims fall within negligent supervision. *See Gainey v. Kingston Plantation*, No. 4:06-3373-RBH, 2008 WL 706916, at *7 n.4 (D.S.C. Mar. 14, 2008) ("It does not appear that South Carolina recognizes a claim for negligent training separate and apart from one for negligent supervision.").

11

to perform the job himself, that he had problems securing equipment with chain binders, or that he would disengage a chain binder while another person was inside the equipment secured by the binder.  Snowden has not produced any other evidence that would have put United on notice of such things.  In contrast, United has produced several years' worth of evaluation reports for Eggers.  In the reports, Eggers consistently rated either as "very good" or "good" on safety issues and is described as being "very safety conscience [sic] when loading and unloading equipment." (Def.'s Mot. for Summ. J., Ex. 15, Eggers Evals. & Training Rs., ECF No. 27-16, at 39.)

At most, Snowden has shown that Eggers may have lacked the skill to drive excavators onto drop-deck trailers.  "However, even if [United] knew or should have known that [Eggers] was not the best [excavator] driver, [Eggers'] past conduct does not rise to a level at which [United would be put on notice that [he] presented an unreasonable risk of harm to the public." *Hoskins*, 676 F. Supp. 2d at 447.  Indeed, in this case, the connection between the incident in question and the prior conduct is even weaker than the inadequate connection in *Hoskins*.  In *Hoskins*, the incident in question and the prior conduct all involved the employee driving her car irresponsibly.  Here, however, there is no such common element.  The evidence on which Snowden relies all relates to Eggers driving equipment onto trailers, but Eggers' driving did not harm Snowden.

As for Eggers' superiors lacking experience in equipment transportation, Snowden cites no authority for the proposition that a company engages in negligent supervision merely by employing managers who have never done some of the tasks that their employees perform.  It is doubtful that South Carolina law would embrace such a rule.

Because Snowden has failed to present sufficient evidence that United reasonably should have anticipated either version of this incident, he has failed to establish that United directly

12

owed him any tort-based duty. Accordingly, the Court will grant summary judgment for United on Snowden's claims for negligent training, supervision, and entrustment.

### iii.     United's Duty of Good Faith and Fair Dealing

Lastly, Snowden argues that the rental agreement imposed upon United a duty to act in good faith and to deal with him fairly. Snowden bases his argument on the covenant of good faith and fair dealing that South Carolina law implies into contracts. *See Comm. Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481, 484 (S.C. 1966) ("[T]here exists in every contract an implied covenant of good faith and fair dealing." (citations omitted)). Because the implied covenant is "merely another term of the contract," an allegation that a defendant breached the covenant is merely a breach of contract claim, rather than an independent cause of action. *RoTec Servs., Inc. v. Encompass Servs., Inc.*, 597 S.E.2d 881, 884 (S.C. Ct. App. 2004). Although South Carolina has recognized a tort action for breach of the implied covenant of good faith and fair dealing, that action is unique to insurance law. *See Williams v. Riedman*, 529 S.E.2d 28, 36-40 (S.C. Ct. App. 2000) (discussing the development of bad-faith tort claims for denial of insurance benefits and declining to extend such claims to breaches of employment agreements). Snowden has not persuaded the Court that South Carolina law would allow a tort claim for breach of a rental contract's implied covenant. The Court holds that the rental agreement's implied covenant of good faith and fair dealing did not create any duty on which tort liability could be imposed.

### B.     *Effect of the Rental Agreement on Snowden's Negligence Claim*

United argues its contractual privity with Snowden[7] bars his negligence claim. United bases its argument on *Bahringer v. ADT Security Services*, a case in which this Court held that an alarm services provider did not owe its customer a duty of due care because there was no "special relationship" between the parties. 942 F. Supp. 2d 585, 589–90 (D.S.C. 2013). In *Bahringer*, the Court relied on *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85 (S.C. 1995). That case involved the economic loss rule, which delineates the circumstances in which tort claims are available as means to recover purely economic losses. *See id.* at 87–89. Explaining the rule, the South Carolina Supreme Court stated that "whether the plaintiff may maintain an action in tort for *purely economic loss* turns on the determination of the source of the duty plaintiff claims the defendant owed." *Id.* at 88 (emphasis added). Later in its discussion of the economic loss rule, the Supreme Court made the statement this Court quoted in *Bahringer*: "In most instances, a negligence action will not lie when the parties are in privity of contract. When, however, there is a special relationship between the alleged tortfeasor and the injured party not arising in contract, the breach of that duty of care will support a tort action." *Id.*; *see Bahringer*, 942 F. Supp. 2d at 589. Importantly, the Supreme Court was still speaking in terms of cases involving only economic loss.

Snowden's case does not involve purely economic losses. Rather, Snowden seeks compensation for medical costs, as well damages as for pain, suffering, and hedonic damages.[8]

---

7.   United speaks inconsistently on whether it contracted with Snowden himself or with his company. When it argues that privity bars negligence claims, it states it contracted with Snowden. However, in response to an argument by Snowden that he had inferior bargaining power when he signed the rental agreement, United states Snowden was only signing the rental agreement "on behalf of his company, J.W. Snowden Company." (Def.'s Reply in Supp. of Summ. J., ECF No. 43, at 11.)

8.   In fact, it appears Snowden is not seeking economic losses of any type. He admits he is not seeking payment of lost past or future wages, loss or earning capacity, "or any other economic damages relating to his inability to work." (Def.'s Mot. for Summ. J., Ex. 14, Pl.'s Resp. to Def.'s Req. to Admit, ECF No. 27-15, at 1.) In addition, he has prepared a list of damages that does not include any part of the rental agreement price or the additional $100.00

14

The economic loss rule does not apply here, and therefore the special relationship requirement from *Tommy L. Griffin Plumbing & Heating Co.* is not relevant to this Court's analysis. In any event, neither that case nor *Bahringer* states, as United suggests, that privity between the parties to a lawsuit "bars" an otherwise valid negligence claim. On the contrary, *Tommy L. Griffin Plumbing & Heating* makes clear that contractual privity and a duty of due care can co-exist under the right circumstances. *See* 463 S.E.2d at 88 ("A breach of a duty arising independently of any contract duties between the parties . . . may support a tort action."). Therefore, Snowden's contractual privity with United does not preclude Snowden's negligence claim.

### C.     *Remaining Issues*

The parties have identified conflicting evidence on factual questions that are material to the other issues they have raised: breach of duty, proximate causation, comparative fault, and assumption of risk. For example, there is conflicting evidence on whether Snowden volunteered to load the excavator or did so at Eggers' insistence;[9] whether Eggers actively participated in Snowden's loading of the excavator or merely watched Snowden; and whether Snowden was driving the excavator when it fell. A jury must resolve those disputes and others in order to decide whether United is liable in the first instance and, if so, whether Snowden shares any of that fault. Jury selection is set for October 21, 2015.

---

Snowden states he later agreed to pay in order for United to pick up the excavator. (*See* Def.'s Mot. for Summ. J., Ex. 12, Pl.'s Answers. to Def.'s Interrogs., ECF No. 27-13, at 8).

9.     United acknowledges this issue of fact but states, in a conclusory fashion, that the issue is immaterial. The Court disagrees. The outcome of that issue could affect a jury's decision on issues such as breach of duty, implied assumption of risk, and comparative fault.

15

## **CONCLUSION**

Therefore, for the foregoing reasons, it is **ORDERED** that United's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. Specifically, United's motion is **GRANTED** as to the breach of contract claim. United's motion is also **GRANTED** as to the negligence claim, with the exception of Snowden's theory of United's liability for Eggers' negligence. On that specific theory, United's motion is **DENIED**. Pretrial briefing, jury selection, and trial shall proceed as previously scheduled.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**September 21, 2015**
**Charleston, South Carolina**